DUCKER, JUDGE:
Claimant, Baxter Curtis Griffith, as Administrator of the Estate of Bernard William Griffith, deceased, alleges that the decedent, Bernard William Griffith, eighteen years of age, was an incarcerated inmate serving an indeterminate sentence of one to ten years in the West Virginia State Penitentiary in Moundsville, West Virginia, when he was killed by a fellow inmate, Roy Allen Thomas, on June 12, 1969; that the respondent was negligent in the care, control and custody of the decedent; that the respondent knew that a fight had occurred on the day of the slaying and no precautionary measures were taken to see that the assailant and the victim were separated; that respondent had knowledge of the drinking of liquor by inmates in the boiler room of the prison on the day of the slaying and were negligent in failing to take affirmative corrective action; and that the supervising officers in the boiler room were negligent in failing to take affirmative corrective action; and that the supervising officers in the boiler room were negligent in their duty of maintaining order, in not remaining at their assigned duty posts, thus rendering it impossible to do their duty; and that by reason of such alleged negligence and the resulting death of Bernard William Griffith, the claimant alleges damages in the sum of $113,000.
There is little, if any, controversy or dispute of the facts as testified to by the witnesses, and our decision must rest upon the question as to whether such facts prove negligence on the part of the agents of the respondent which could be considered the proximate cause of the death involved and render the respondent liable in damages therefor. *264 Counsel for the claimant and counsel for the respondent have submitted excellent briefs in support of their respective positions and the reading of their briefs leaves the Court with a difficult decision in the matter, as the pro and con of the question of liability depends so largely upon how much protection must be afforded an inmate from his fellow inmates, and upon what amounts to negligence in that regard which according to law is compensable.
We will first review the principal facts. Claimant’s decedent had been convicted on August 30, 1968, of grand larceny in Greenbrier County, and on September 10, 1968, he entered the prison at Moundsville. After successive work assignments in the prison he was on his last day on the morning shift in the prison boiler room. Prior to his death, he was placed in the guard house for one day for fighting with his fellow inmate, Robert Mullens, and subsequently he was placed in a segregated cell for sixty days for being intoxicated and, upon being released on May 15, 1969, returned to his boiler room assignment. On June 11, 1969, he was placed in the guard house for one day for cursing an officer when he was awakened for work to be done in the boiler room.
On the day the decedent met his death Roy Allen Thomas, another inmate who had been returned to the prison some eleven days prior to Griffith’s death and who, it appears, had a previous rather bad reputation both in and out of prison, was also assigned to duties in the boiler room, and during the morning of the day of Griffith’s death, Griffith and Thomas consumed some contraband liquor commonly referred to as “julep”, and later that morning they were engaged in an altercation in which Thomas was struck in the face and suffered a broken nose, and about 2:00 p.m. that afternoon, Thomas was “locked up” for being drunk. The body of the decedent was found about twelve o’clock noon that day in the shower room adjacent to the boiler room, and an autopsy revealed that death had been caused by “skull fracture”, and that Griffith had been bludgeoned to death with a pipe wrench. There was found on the deceased after his body was taken to the hospital for the autopsy a dagger made out of a screwdriver. Thomas was later indicted for the killing and upon his plea of guilty of involuntary manslaughter was sentenced to a one year term in the penitentiary.
Counsel for the claimant in. his brief relies largely upon the following facts in support of his claim.
*265 There was only one guard assigned to the general area of the boiler room and that guard also had the responsibility of maintaining security and maintenance in the carpenter shop, plumbing shop, electric shop and engine room. There was only one guard stationed at the end of the alley which extends in front of the boiler and shower rooms, and he had the responsibility of maintaining two gates in the prison industries fence and his position was not where he could observe the alley or inmates standing or passing through the gates.
Tools, including hammers, screwdrivers, and pipe wrenches were contained in the prison industries area of the boiler room, plumbing shop and carpenter shop, which tools were checked out to various inmates to perform their work duties by other inmates from a locked cabinet in the plumbing or carpenter shop, and one guard is responsible for such check-outs and returns, and such guard would be asked for the tools or the inmate could get tools from the cabinet sometimes when the cabinet was not locked, and return it sometimes when the guard was not present. One witness testified that on the day of the death a tool shack located beside the boiler room which contained a hammer was wide open and unattended. William Pugh, an inmate, testified that he had had an argument with decedent that day and decedent had threatened him with a hammer, and also that he had observed Roy Allen Thomas standing in the door of the shower room and that it was evident that Thomas had been drinking and that his face and nose were swollen.
Evidence of other facts which we consider of a minor nature was introduced in support of claimant’s contention that the prison was not properly operated and that such facts were evidence of a pattern of conduct which amounted to actionable negligence on the part of the officials of the respondent. Although we have heard and considered all the facts proven in considerable detail, we cannot in this opinion attempt to recite all of them, and we can only refer to such of the evidence as we consider vital or pertinent in our determination of the issues of the case.
As indicated by counsel for the claimant there are two questions presented for decision; namely, (1) did the respondent violate its duty to the claimant’s decedent of exercising reasonable and ordinary care under the circumstances to protect decedent from harm, and (2) did respondent’s negligence proximately cause the death of the claimant’s decedent.
*266 The following language in the annotation in AlALR 3d 1021, describes the problem confronting prison officials in cases of this kind:
“The prison environment has been a fertile ground for assaults, as it normally consists of confinement in close quarters and under unpleasant conditions of large numbers of persons, many of whom are predisposed to violence and frequently, to grudges, racial hatred, and homosexual jealousy. To these factors may be added the frequent impossibility of maintaining the desirable degree of isolation of the prisoners from each other, and the extreme difficulty of preventing them from fashioning weapons out of articles at hand, in which respect prisoners have demonstrated considerable ingenuity.”
And in Johnson v. United States, 258 F. Supp. 372, it was held that where one inmate stabbed another, the stabbing was not due to any negligence on the part of the prison officials and that the Government was not an insurer of the safety of the inmates.
And in Brown v. United States, 342 F. Supp. 986 (1972), the Court said:
“It is well established that those holding prisoners or convicts in custody are not insurers of their safety. However, the custodians owe a duty to their charges to exercise ordinary care for their safety, and that duty includes the duty to use ordinary care not to expose a prisoner to an unreasonable risk of injury at the hands of some other inmate or inmates ... In order to. meet the requirements of ‘ordinary care’ the care employed must be commensurate with the danger that is apparent or reasonably to be foreseen.”
Counsel in their briefs have cited numerous decisions from various jurisdictions as to the law relating to the duties of wardens and others in charge of incarcerated prisoners, but there appears to be none from our Supreme Court which is of aid on the question. As the facts in the cases cited are all more or less different from those in this case, it will serve no purpose, we think, to cite or quote from them here.
In our consideration of this case, we must weigh the evidence as a whole and not be guided by one or more single items or facts occurring mainly in the course of one day to determine whether or not *267 the respondent has exercised reasonable and ordinary care as to the incarceration of claimant’s decedent or his assailant. If respondent has done that which was apparently reasonably necessary, it has fulfilled such duty, but, if not, and respondent has been so negligent that such failure was the proximate cause of the death of the inmate, it is liable. In this connection, we do not attach much significance to what might appear as the bad reputation of inmates prior to entering the prison, because prison officials are not investigators of the previous characters of inmates who by their convictions have become felons. However, prison officials cannot ignore bad conduct of inmates while in the prison. Generally, it takes more than a few days, or even a few months sometimes, to reach the conclusion that a particular inmate should be isolated from the others. We do not think that the previous record of Thomas was sufficient to place extra precautions for the safety of the decedent or to isolate either Thomas or the decedent during their confinement, especially since all the dangerous conduct occurred mainly in the space of a few hours of the day of the tragedy. While the matter of making and drinking the so called “julep” cannot be condoned, nevertheless, that was a problem with which the authorities had to come to grips, as to the whole prison population and to prevent it, if possible.
The evidence as to the location of the crews and the sufficiency of the guards in the operation of the prison industries, the guarding of area of the alley, boiler room, shower room, and the accessibility of tools for the work are all stressed by the claimant as constituting negligence on the part of the officers of the prison. We cannot agree with such a conclusion, and surely not to the extent that such negligence can be construed as the proximate cause of the death of Griffith. While it is the duty of prison officials to exercise ordinary care for the safety of their charges, such care need only be commensurate with the danger that is apparent or reasonably to be foreseen. We cannot conclude that the availability of the tools used in the work of the prison for some illegal attack with the tools could be the real proximate cause of the death of claimant’s decedent, no more than it could be said that because one had a shovel to fire a furnace, and struck another fireman over the head with it, the possession of the shovel was the proximate cause of the death of the other. Nor was the conduct of the decedent anything but an aggravation, and it was more of a probable cause of the resulting death than anything else. The decedent was entitled only to reasonable and ordinary care for *268 his safety, not extraordinary care. He, too, should have exercised ordinary care for his own safety.
While prison reform is very desirable and necessary today, it cannot be a substitute for the law of this case. Neither can the widely publicized shortcomings and failures of our State prisons be a subject for consideration. This Court may not be influenced by the broadly held opinion that our prisons are not efficently operated. Our plain duty is to decide this case upon the evidence in the record and the law as we believe it to be applicable.
We are of the opinion that the evidence in this case has not shown such negligence as proves a failure of the officials to perform their duty in taking reasonable care of the decedent or was the real proximate cause of the claimant’s decedent’s death. We, therefore, hereby disallow the claim of the decedent’s administrator.
Claim disallowed.